Good morning, Your Honors. I'm Mr. William Osterhaus, and I represent the appellant in this case, Mr. Joseph Shelton. Your Honors, I think I'm familiar with the parties that briefed rather thoroughly the facts underlying this case and the alleged Brady violation that occurred, one that this Court dealt with about 10 years ago in a case involving the co-defendant of Mr. Shelton, Silva. The question I think here is that I would respectfully address is one that the Court called to our attention when it told us to be prepared to discuss In a case where, as here, the last State court opinion to address the claims of the 2254 petitioner addressed a prong or one prong of a claim and not the other or others. In this case, when Mr. Shelton eventually found out about this Brady violation, it was concealed for many years. In fact, it was concealed until he was subject to the constraints of Section 2254d. His co-defendant, Silva, who was sentenced to death, had counsel ride along and learn earlier of the evidence that had been excluded. When Mr. Shelton found this out in the prison library, he brought his case. He claimed a Brady violation. He had to prove three elements, of course. He had to prove that the evidence in question was favorable, that it was indeed withheld by the prosecution. And finally, that it was material. In other words, that he suffered prejudice as a result of the failure to reveal this. The Supreme Court responded in a brief order saying that essentially there was nothing favorable to him or they couldn't say there was any. I think the Supreme Court, I mean, the Supreme Court clearly ruled, without elegance or elaboration, certainly, but said that the evidence brought forward, that the evidence was concealed from Mr. Shelton was not favorable. It failed, therefore, the first prong of Brady analysis. Is it possible to read that, given that that judge had the benefit of Silva, which pretty well addresses prongs one and two? Is it possible to read the Superior Court order as an order that really says it didn't make a difference to Shelton, in other words, as a prong three analysis? Well, I don't think it's possible to read the order that way. I think we take too much liberty if we do that. With respect, Your Honor, I mean them. He used the words favorable. So at first glance, it sure looks like a prong one analysis. You know, I'm not trying to contort the words. I'm also trying to understand how a jurist would get there, given that he had the benefit of the Silva ruling. In fact, that's what prompted Shelton's petition, right? To stop the secret deal. Well, Your Honor, I don't know why he arrived at that conclusion. But I think we have to take him at his word that he didn't think this was favorable evidence, because it's very easy to talk about prejudice and materiality if that's what we're thinking about. Judge Hamilton in the court below did it for 50 pages or so. And I think all we would have expected the Superior Court to do in that situation was to tell us, well, you know, this isn't favorable because, I mean, it's not material to you, Mr. Shelton, because your co-defendant didn't testify, he didn't have some of the liabilities you have as a result of your testimony and other actions you engaged in, and therefore, the testimony was not so significant, and withholding it did not undermine our confidence in the outcome the way it did in Silva's case. Those were minimal things you say, I would suggest, respectfully, when you're addressing materiality and basing a Brady decision on it. And since he didn't do that, I say we have to view that decision as not addressing the materiality, prejudice problem of Brady. And therefore, I suggest that under Amito and under the cases it cites, Wiggins v. Smith, Pompeo v. Beard, that that's entitled to de novo consideration. And I think in the court below, of course, the court spent a long time discussing materiality, Your Honor, but she did so, I think, always with the perspective that we were governed by the constraints of AEDPA, by the 2454d when she did it. And I think that when you look at this objectively and don't accord deference to which we don't think that judgment's entitled in the superior court on the issue of materiality, I think it's clear that Mr. Shelton does satisfy all three prongs of Brady. At this stage, nobody disagrees about the first two. Judge Hamilton found that it was favorable. It was clearly concealed, although the prosecution took a long time to concede that fact, it was concealed. And eventually, when it was – when you look at it and you look at the trial, it's hard – I see how one can conclude it wasn't material. I mean, it's easy, as Judge Hamilton did, to go through the liabilities under which Mr. Shelton's testimony suffered at trial. I mean, it wasn't ideal. His conduct wasn't model. But what I think the judge went a bit astray on is that what she did is he took it down and she said, well, I take away the evidence that wasn't given to you and it's still sufficient to show that you had the intent to do this, you know, to kill both of these victims, that you had the intent to steal Laura Craig, you were involved, you intentionally did that, but it could still say that sufficiently. But I don't think in a Brady analysis we're talking about sufficiency. We're talking about whether this concealed evidence would have made a difference, whether there was a substantial probability of a different result. And remember that no matter what was wrong with Shelton as a witness, the other guy, his lawyer thought he was crazy and perhaps insane. The prosecutor thought it was so important to the case that he was willing to conceal that and postpone an examination mentally until after he testified against Silva and Shelton. So I think that it was material, and I think that we can't – he might not even have testified. Mr. Shelton might not have testified in his case. We can't say. But if he was – if Thomas was so heavily impeached as we think he could well have been, then I think that there might have been a rational conclusion of his lawyer not to put him on the stand even, Shelton. Thomas was impeached, wasn't he? The jury knew that he had a closed-head injury, that he'd been comatose for 30 or 40 days, had memory problems. They did hear all that, didn't they? Yes. All right. But they didn't hear – they also heard Thomas say that he thought he was getting better and that he was recovering from that. So what they didn't hear, if I'm understanding the record correctly, they didn't hear that he'd cut this deal to not be evaluated. Didn't hear that and didn't hear – that's right. Yeah. They didn't hear that he cut the deal with the prosecutor, he wouldn't be prosecuted for murder, and that he wouldn't be examined until later, you know, it was withheld. So the deal was – part of the deal was withholding this evidence from the defense. And that, I think, was a critical – a critical situation that did undermine our faith in the result of that trial. And I think that, you know, one can go through all the factors that Judge Hamilton did, but I think that clearly it was a different kind of impeachment than the ones that, Judge Christian, you referred to. He was impeached about having a head injury, but he said he was getting better. He wasn't showing that it was as serious as it was or that his own attorney thought so and that the prosecution was willing to enter into this bargain. It was a different kind of impeachment. And this Court has recognized that when you have a different kind of impeachment than that which was done, then on an analysis like this, when you're considering what was withheld, that one – you know, that that's an important consideration that it's something new and different. And the matter of his intent, his intoxication, all these things he was against. I mean, in his briefing, I think the Attorney General has minimized the extent to which – to which Shelton and Thomas differed in the things they said. The jury was entitled to believe Thomas or Shelton, but the inquiry was skewed. The inquiry was skewed by the withholding of this information. I know, Your Honor, if you have permission, I reserve a minute for rebuttal, unless the Court has any questions for me now. Thank you, Your Honor. Thank you. May it please the Court. Peggy Ruffray from the Attorney General's office for a Respondent. Your Honor, the district attorney's thorough and cogent opinion explaining why the holding in Silva v. Brown is not controlling and why habeas relief is not justified here relied on two factors. One, Silva was a pre-ADPA case where the Court reviewed the State court's ruling de novo instead of the deferential review that's required here. And second, Norman Thomas's testimony was simply not as significant in this case as it was in Silva's trial. First, we'd like to address the amato issue. And it's our position that the superior court did rule on the third prong of Brady, on the materiality prong. And it's true that it used the words favorable petitioner, but I think you have to look at the order in context and the entire order. The order specifically cited Silva v. Brown. And in Silva v. Brown, the Court had said that the first two elements of Brady were clearly established at the evidentiary hearing, and in fact, the State didn't even dispute those elements at the evidentiary hearing. Right. But as you just conceded, Silva was a different trial. And so Thomas's testimony in Silva's trial was even more significant, even more important than it was in Shelton's, wasn't it? There were several statements that Shelton gave pretrial. Thomas's testimony was more important in Silva's trial than Shelton's. Right. And so what the superior court was doing in this order was distinguishing the Silva case from the Shelton case. And we know that because the very brief order, it's not an appellate court opinion, it's an order by the Lassen County Superior Court. It said Thomas's testimony identified Silva rather than Petitioner as the trigger man. It is difficult to conclude that anything favorable to Petitioner was suppressed. Now, where did that come from? That came directly from Silva, where the only issue was materiality. And this Court held that it was material in Silva's case because, this is the quote, Thomas's credibility was a critical issue given that he was the only witness who could identify Silva as the trigger man in Thorpe's murder. That's where that came from. Yes. So the district court was saying materiality is at issue here. In Silva, it was material. In this case, it is not material. I think that's the import of that order, that they were ruling on the materiality issue. That's certainly how the district court interpreted it. And the district court interprets this as a prong three Brady analysis. Yes. She didn't do it the way you just did it or the way I did it in my question to opposing counsel. She got there a different way. Well, she said, Although the State court used the phrase favorable Petitioner, the decision does not expressly hold that the undisclosed evidence failed to satisfy the first Brady element. A reasonable basis for the State court's denial is that the evidence at issue did not satisfy the third Brady requirement of materiality. And I think that's different than saying I think what the superior court meant is to reach the third prong. Well, a reasonable basis for the State court's denial is I would respectfully disagree. I think the district court was saying this is how I am interpreting the State court's opinion. That's if there was some other word. But when, you know, Brady requires two findings, according to Bagley, it has to say both that it's favorable to the individual and material to the case. Now, the State court said it's favorable. That's a separate finding that's necessary and did not reach the other one about whether it's material. You have to find it favorable and then find material. And the court said it was finding favorable. Your Honor, it's our position that was an inartful way to say it, but as I just explained, in the context of the entire order where it was distinguishing this case from Silva where the first two elements were clearly met and the State even conceded. The only issue was materiality. And the question was whether Thomas was the only person that identified Silva as the trigger man. That's what the phrase that the superior court referred to as to materiality. So it's our position that that was a ruling on the third prong. And the overarching view of this, of how this Court has to look at that order, is it has to give the State court the benefit of the doubt. That's what the Supreme Court has told this Court repeatedly, that State court rulings must be given the benefit of the doubt. So it's our position that that was, in fact, a materiality ruling that must be required deferent – reviewed deferentially. I also have a side note on the Amato case, which is that I think it is possible that that holding is in question based on the Supreme Court's recent grant of certiorari review in Chappelle v. Ayala. It's – it's – cert has been granted, no briefing has happened, but it will be decided this term. And the question is on how Federal courts should evaluate State court findings on prejudice after Richter and Johnson, where it's a component of a claim. So it's a little unclear whether they would reach the Amato type of issue, but it's certainly possible that that will be a broad opinion, and the Supreme Court even added a question to the grant of cert. So it is possible that that holding will be called into question based on the ultimate ruling. If it – if it is, we'll be happy to supply a supplemental briefing if that ends up being the case. Our second position that is the superior court's order was not so lacking in justification that it was beyond any possibility for fair-minded disagreement, which is the deferential standard of review. But we would go even further and say even under de novo review, this case is so different from the Silva case that the excluded impeachment was not material. Now, how do we know that? You have to look at the two cases separately. And in this case, Shelton testified, unlike Silva. And his testimony established at a minimum that he was guilty of aiding and abetting Silva. The second prong is that he made numerous statements to police, and the prosecutor relied heavily on those prior inconsistent statements in the argument. In fact, the prosecutor specifically argued in closing – this is right at the outset of his closing – he says, Norman Thompson is not really the essential witness, even an essential witness, against Joseph Shelton. That's at Reporters' Transcript 1076. So right from the beginning, the prosecutor is saying, Norman Thomas is not what I'm relying on. I'm relying on Shelton's own statements. He testified. He was not credible during his testimony. He made many, many prior inconsistent statements to the police. At first, he denied that he was even at the scene. Then he ultimately said he was there, but he was in the cabin. Then he ultimately said he was there and actually participated in the killing. What did they have that just went to premeditation? There's a statement by Shelton about the three men talking in advance about abducting a person, and if they did, they might have to kill that person. And is this – are you referring to the kidnapping or the murder of Thorpe? I'm referring to the murder. It's an acknowledgment, and I think that Shelton and Thomas both testified that there had been at least one conversation ahead of time about this plan to abduct people, to take them back, and if they did that, they might have to kill them. Yes. Was there anything else that went to premeditated murder? Yes. And this is part of the many inconsistent statements. But Shelton eventually – at one point when he said that he was the one who stayed in the cabin, he said that the other two came in and said that he should turn up the stereo to drown out the sounds of the shooting that they were just about to do. Then he eventually admitted that he was the one that went with Silva to take the victim up and kill him. So it was clear from that inference that he and Silva, in fact, were the ones who came into the cabin and told Thomas to turn up the stereo to drown out the sounds of the murder. Well, it's not clear. He said it both ways. He said it both ways, and he testified differently. He testified differently, but he did ultimately in his testimony admit that he was the one that went with him. He also said that he jumped out of the way – he got out of the way when Silva came back with the weapon because he knew he was going to kill him and he didn't want to get hit by the flying bullets from his automatic gun. How does that go to premeditation? The fact that he jumped out of the way when Silva started shooting, how does that go to premeditation? Well, he knew that he was coming back with his weapon and that the person he was going to kill was Thor, the victim. Go ahead. There is one other point. I see that I'm out of time, but there is one very important point that I wanted to make, if I may, because the prosecutor also relied very heavily in the closing argument on Shelton's notes, his jailhouse notes to Thomas, which I think are extremely significant. Perhaps they haven't been emphasized that much in the briefing, but the district court did rely on them, and those are at reporter's transcript 510 to 517. Now, these are his own notes that he wrote to Thomas. He admitted at trial that he wrote these. In fact, he said that while he was in jail, he had gotten the annotated penal code and had been doing a little research, and so he sent these notes to Thomas to try to manufacture an offense. Did any of them go to premeditation? I think they did. And these are the highlights. Okay. I mean, there's more here. But he said that Thomas should say these go to more than just premeditation, but I'd like to briefly highlight the ones. He said to say that Silva told you he'd kill you if he did anything wrong, if you did anything wrong. I'll tell you the story the lawyer in San Fran said would work, and if this works, he said he could get you off. He admitted that he was actually the lawyer. He's Shelton, had done this research, and he was the lawyer. Read it, memorize it, stay with it. Hopefully the cops won't know until I get out. He told Thomas to say that Shelton didn't know anything about his plans about the kidnap. So he's telling him, don't say I knew anything about the plan about the kidnap. And then I walked out under the light on 395 and got a ride before he left. I got a ride with an old cowboy with a white 62 Impala. He admits that that whole story was a lie. Say I'm not a health angel. Blame everything on Ben and say he kept telling you he was going to kill you and Larry and Laura and me and Dana and all your friends and relatives. And tell them you were on drugs Ben gave you. So those are some of the statements that show that he tried to manufacture a defense. It shows his consciousness of guilt. It specifically goes to some of these issues about the defense of we're going to blame everything on Ben and we're going to say that we were acting under duress. Thank you, counsel. Thank you. I will give you two minutes for rebuttal. I think that we don't show a proper deference to state court rulings if we deny the words they say. And I do believe that regardless of whether the superior court accepts Silva's opinion or not, regardless of what that court thought about Silva's case, the court used the words that the court used, that he hadn't satisfied the favorability prong. So I do respectfully disagree with my adversary. I say that that should be taken as word and, therefore, the matter of materiality has not been ruled upon and entitled to de novo review. Now, the Respondent has argued, though, that de novo review, even using that standard, is so clear that it couldn't have helped anything. It wouldn't have undermined confidence in the outcome had this been disclosed. But when you look at the whole record, I respectfully say that's not true. It is true that that material came in that Shelton did these things when he first got arrested. He testified about those. He said he was still under the influence and he was still not thinking clearly and he was still in a basically drug-induced haze when he was operating in the jailhouse in the early stages. He – much of what he said about – in those notes about the threats made by Silva were the same thing he said at trial. And Silva, indeed, supposedly was an executioner for an outlaw motorcycle gang and a dangerous man. Shelton's defense was basically that he did not intend that these people be killed. And at every stage of that, he was contradicted by Thomas. The 707 of the reporter's transcript is a part where there's a discussion that was there a prior discussion with the three men involving kidnapping somebody they'd be killed. Our reading of that is that Shelton said he – there was such a discussion that he didn't say he participated in that. He said it was something Silva said. He wasn't participating in it. Nothing shows premeditation on his part. Your Honor, it's my judgment to engage in this. And certainly nothing without the testimony of Shelton, you know, to contradict almost every significant thing he said. And I think that had the jury had before it this evidence of – this concealed evidence about the mental state of Shelton or how – of Thomas, how serious that was taken by the prosecutor, the prosecutor, according to the Respondent, did not rely on Thomas very much. But that's not true. The testimony of Rex Gay, the attorney for Thomas, is that he – the prosecutor readily agreed that he couldn't convict either of these defendants, Silva or Shelton, without Thomas. And also in his argument, he did rely on Thomas. He also cut Shelton up a lot, but always he did it with the context of what Thomas  So I don't think we would be truthful and faithful to the record if we say that Thomas was not extremely important here and this was material evidence. Thank you, counsel. Thank you, Your Honors. This argument is submitted. The next case is Shirley v. Gates.
judges: Reinhardt, Thomas, Christen